# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BENNY RAMIREZ; MARIA RAMIREZ; and as surviving heirs of JORGE RAMIREZ, deceased,<br><br>              Plaintiffs,<br>  v.<br><br>COUNTY OF SAN DIEGO, a municipal corporation; Captain ROB AHERN, an individual; Deputy MARK RITCHIE, an individual; and DOES 1 through 100, inclusive,<br><br>              Defendants. | CASE NO. 06 CV 1111 JM (JMA)<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Doc. No. 76 |

　　　Defendants County of San Diego, Rob Ahern, and Mark Ritchie, move for summary judgment or partial summary judgment on Plaintiffs' complaint, which sets forth claims arising out of an officer-involved, fatal shooting of Plaintiffs' son, Jorge Ramirez ("Ramirez"). Plaintiffs filed an opposition (Doc. No. 77, Opp'n) and Defendants submitted a reply brief (Doc. No. 79.) Following the parties' oral arguments on April 3, 2009, the court took the matter under submission. After considering the papers and the parties' arguments, and for the reasons set forth below, the court **GRANTS IN PART** and **DENIES IN PART** the motion for summary judgment.

　　　　The parties each made requests for judicial notice of various documentary evidence. (Doc. Nos. 76-9 and 79-2 (Defs.) and 77-18 (Pls.).) Plaintiffs lodged numerous objections to evidence offered by Defendants. (Doc. No. 77-19, Obj. to Evid.) Where the court makes reference to a

particular document, the parties may assume the court has granted judicial notice thereof for the purposes of the summary judgment rulings only. For documents not cited in the following discussion, the court has declined to rule on the relevant request for judicial notice. Finally, any factual findings contained in this order are based on the evidentiary records before the court and are made for the limited purpose of aiding the court in its rulings herein.

## I. BACKGROUND

On July 29, 2005, at about 9:00 p.m., a Circle K convenience store in Vista was robbed at gunpoint by two Hispanic males in their twenties wearing dark gloves, clothing, and bandanas over their faces. (Defs. Mem. Supp. Mot. ("Mot.") at 2; Decl. Ritchie at ¶ 3-4.) Law enforcement agents were immediately notified, and the particulars were broadcast by radio along with an alert regarding a similar commercial burglary carried out the day before by similarly described suspects driving an "all black" two-door Jeep Wrangler. (Id.; Doc. No. 77 ("Opp'n"), Exh. 11.)

Although Deputy Mark Ritchie was going on 15 hours of duty, he was on patrol and responded to the call. (Mot., Decl. Ritchie at ¶¶ 3-4.) Based on his familiarity with the area, he reasoned the nearby, low-traffic area of Thibodo Park might serve as a staging area or escape route for the robbers. (Id. at ¶ 5.) As Deputy Ritchie neared the park entrance, he saw a "dark colored Jeep Wrangler" (actually a navy Jeep Wrangler with a grey hard top, see Opp'n, Exh. 13) and a small car following close behind exit the park's parking lot onto Lupine Hills Drive. (Mot., Decl. Ritchie at ¶ 5.) Deputy Ritchie shined his spotlight on the tailing vehicle, which abruptly pulled to the side of the road and stopped. (Id. at ¶ 6; Opp'n, Exh. 2–Interview.) With his spotlight on the Jeep, Deputy Ritchie saw three occupants inside, and the Jeep also stopped quickly after a short distance. (Mot., Decl. Ritchie at ¶ 6.) The occupants of the Jeep jumped out and ran in different directions: the two passengers into a wooded, residential area adjacent to the park and the driver, later identified as Jorge Ramirez, down the street back toward the park entrance. (Id.; Opp'n, Exh. 2 at 90.) According to Deputy Ritchie, the men matched the robbery suspects' description. (Mot., Decl. Ritchie at ¶ 6.) Deputy Ritchie exited the patrol car without transmitting his location by car radio and began chasing Ramirez on foot in an easterly direction. (Id.) In his pursuit, Deputy Ritchie passed the second vehicle as it drove away in the opposite direction. (Id.)

1   After a short distance, Deputy Ritchie saw Ramirez reach to the front of his trousers waistband with his right hand. (Id. at ¶ 7.) According to Deputy Ritchie, based on his experience, he was concerned Ramirez was reaching for a weapon, particularly since the earlier robbery had been perpetrated by suspects armed with a gun. (Id.) Deputy Ritchie therefore began firing his weapon at Ramirez while the two continued running. Over the next tenth of a mile, while running at full speed, Deputy Ritchie fired 16 rounds at Ramirez, including 11 in an area approximately 150-200 feet east of the patrol car and another five approximately 300-400 feet farther east. (Opp'n, Exh. 12.) Two of these latter five shots hit Ramirez in the posterior right leg. (Id.) Ramirez then slowed and fell to the pavement on his right side. (Mot., Decl. Ritchie at ¶ 7.) According to Deputy Ritchie, he attempted to call for back-up on his portable radio during the foot pursuit, but received low-battery signals from the radio. (Id. at ¶ 10.) Two broadcasts made during the chase appear to have been cut off. (Mot., Exh. M-2.)

Deputy Ritchie approached Ramirez with his handgun trained on the suspect. (Mot., Decl. Ritchie at ¶ 7.) He then saw the second vehicle returning down Lupine Hills Drive toward him. (Id.) In addition, Deputy Ritchie observed Ramirez moving his body, particularly his arms moving about his midsection. (Id. at ¶ 7-8.) According to Deputy Ritchie, because of the dark of night and Ramirez's dark clothing and gloves, he was unable to distinguish the exact movements, but believed Ramirez was still attempting to reach a weapon to use against him. (Id. at ¶ 8.) Deputy Ritchie felt "Ramirez's actions constituted an imminent threat of serious bodily injury or death," particularly in light of the returning second vehicle and unknown locations of the other Jeep passengers, so he reloaded his weapon and fired an additional six times, striking Ramirez in the chest. (Id.; Opp'n, Exh. 2–Interview, Exh.12.) Ramirez fell back to the pavement, ending in a prone position with his arms outstretched. (Mot., Decl. Ritchie at ¶ 8.) The driver of the approaching second vehicle, Ariana Sosa, testified in her deposition that she believed Ramirez was attempting to raise his hands in surrender but her testimony is unclear as to whether she believed Ramirez's hands were raised before, during, or after the point when Deputy Ritchie fired his weapon. (Opp'n, Exh. 10 at 65:20-21, 66:22-67:25; Defs. Reply, Exh. W at 63:14-20.) After firing the final six shots, Deputy Ritchie successfully broadcast a request for someone to call his cell phone. (Mot., Decl. Ritchie at ¶ 10.)

Based on Plaintiffs' representations during oral argument, four claims remain to be litigated. (See First Amended Complaint ("FAC"), Doc. No. 81.) Two claims are alleged against Deputy Ritchie, including the decedent's § 1983 claim for excessive force in violation of the 4th Amendment and the § 1983 claim for loss of familial association in violation of the 14th Amendment by the decedent's parents, Plaintiffs Benny and Maria Ramirez. (Id.) Against the County and Captain Ahern, Captain for the Sheriff Department's Vista Patrol Station at the time of the shooting, Plaintiffs assert Monell municipal federal civil rights claims for failure to train and supervise, predicated in turn on the constitutional violations alleged as part of the two § 1983 claims.[1] (Id.) During oral argument, Plaintiffs clarified the Monell claims stem from the narrowly defined factual theory that the County, as a policy, practice, or custom, provided inadequate training to its deputies as to what constitutes "imminent danger" in the context of a fleeing suspect.

//

## II. DISCUSSION

Defendants raise several points in their motion. First, they argue Plaintiffs lack standing to assert the decedent's § 1983/excessive force claim as well as their own § 1983/14th Amendment claims (and by inference, the related Monell claims). Second, Defendants assert Deputy Ritchie's use of force was objectively reasonable under the Fourth Amendment. Third, Defendants argue Plaintiffs' § 1983/14th Amendment claim fails because Plaintiffs did not show: 1) a sufficiently close relationship with their son such that his death constituted deprivation of a constitutionally protected liberty interest and 2) Deputy Ritchie acted with a purpose to harm Ramirez unrelated to legitimate law enforcement objectives. Fourth, Defendants assert Deputy Ritchie is otherwise entitled to qualified immunity. Fifth, they contend the County is not liable under Monell because no County policy, custom, or practice resulted in any constitutional violation. Finally, Defendants argue any award of punitive damages would be improper as a matter of law because no evidence has been presented to show Defendants acted with the requisite culpability.

---

[1] Although Defendants present arguments seeking an award of summary judgment on Plaintiffs' state law claims for battery and negligence, Plaintiffs dropped these claims when they filed their First Amended Complaint. Thus, the court **denies** as moot Defendants' motion for summary judgment on the state law claims.

**A. Standard of Review**

A motion for summary judgment shall be granted where, based on the pleadings, affidavits, and other supporting papers permitted by Federal Rule of Civil Procedure 56(c), "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); British Airways Bd. v. Boeing Co., 585 F.2d 946, 951 (9th Cir. 1978), cert. denied, 440 U.S. 981 (1979). The moving party bears the initial burden of informing the court of the basis for its motion and identifying those portions of the file which it believes demonstrate the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the movant has made such a showing, "the nonmoving party may not rely on the mere allegations in the pleadings in order to preclude summary judgment." Nillson, Robbins, Dalgarn, Berliner, Carson & Wurst v. La. Hydrolec, 854 F.2d 1538, 1542 (9th Cir. 1988) (internal quotations omitted). Rather, the opposing party must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Celotex, 477 U.S. at 324 (internal quotations omitted). At least some "significant probative evidence" must be produced to create a genuine issue of fact for trial. Nilsson, 854 F.2d at 1542. An issue is "genuine" only if, viewed in the light most favorable to the opponent, "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." U.S. v. Diebold, Inc., 369 U.S. 654, 655 (1962); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

**B. Standing**

*1. Decedent's § 1983/Fourth Amendment Claim*

Defendants argue Plaintiffs, as decedent Ramirez's parents, lack standing to pursue the § 1983/excessive force claim on Ramirez's behalf. Fourth Amendment rights are "personal rights" which may not be enforced vicariously but only by "one whose own protection was infringed by the...seizure." Simmons v. U.S., 390 U.S. 377, 389 (1968). Defendants cite to Plaintiffs' responses to interrogatories and production requests which show they were never appointed as the decedent's personal representative and that Ramirez has a child who is now age 12. (Mot. at 23, Exhs. F-1, F-2, G-1, G-2.) Since no probate proceedings were ever initiated, that child is Ramirez's sole heir and successor in interest, yet is not a party to this lawsuit. Cal. Prob. Code § 6402(a). Because Plaintiffs

1  are neither appointed estate representatives nor his successor in interest, they may not assert Ramirez's
2  § 1983/excessive force claim. Cal. Code Civ. Proc. § 377.30; Cal. Prob. Code § 9820. Plaintiffs raise
3  no substantive opposition to Defendants' argument, but challenge the admissibility of the discovery
4  documents mentioned above for lack of authentication. See Orr v. Bank of America, 285 F.3d 764,
5  774 (9th Cir. 2002); (Obj. to Evid. at 10-11.) During oral argument, Plaintiffs acquiesced on this point
6  and declined to challenge the accuracy of Defendants' exhibits. The court therefore **OVERRULES**
7  Plaintiffs' objections to Defendants' Exhibits F-1, F-2, G-1, and G-2 and **GRANTS** Defendants'
8  request for judicial notice of these exhibits. The court also notes that, absent a constitutional violation,
9  there can be no liability under Monell. See Van Ort v. Estate of Stanewich, 92 F.3d 831, 835 (9th Cir.
10 1996) (listing deprivation of a constitutional right as the first element of a Monell claim). Based on
11 Plaintiffs' lack of standing, the court **GRANTS** Defendants' motion for summary judgment on the
12 decedent's § 1983/excessive force claim and the related Monell claim.
13     *2. Parents' § 1983/Fourteenth Amendment Claim*
14     Defendants also argue Plaintiffs lack standing to pursue their own § 1983/Fourteenth
15 Amendment claim. The sole basis for Defendants' challenge is their contention that in order to litigate
16 their claim, Plaintiffs would also have to litigate the same excessive force issue they lack standing to
17 raise on Ramirez's behalf.
18     The parents' due process claim does not require them to prove a Fourth Amendment violation,
19 but rather, Plaintiffs must demonstrate Deputy Ritchie's conduct "shocks the conscience." U.S. v.
20 Salerno, 481 U.S. 739, 746 (1987)("So-called 'substantive due process' prevents the government from
21 engaging in conduct that 'shocks the conscience'") (internal citation omitted). To satisfy this test
22 under the factual circumstances present here, discussed further below, Plaintiffs must show Deputy
23 Ritchie's use of force was done with a purpose to harm Ramirez unrelated to legitimate law
24 enforcement objectives. See Porter v. Osborn, 546 F.3d 1131, 1137-38 (9th Cir. 2008) (the "purpose
25 to harm" standard, rather than the "deliberate indifference" standard, is appropriately applied where
26 an officer acts in a rapidly evolving situation where split-second decisions are required). Although
27 the Ninth Circuit in Porter recognized parallels between the excessive force and due process inquiries,
28 "a parent's loss of a child's society 'raises a different constitutional claim' than the child's direct

1 Fourth Amendment claim." Id. at 1141 ("This is the kind of analysis applied in the analogous
2 jurisprudence governing constitutional claims of excessive force under the Fourth Amendment" but
3 "a different standard of culpability applies to the [parents'] due process claim"); Byrd v. Guess, 137
4 F.3d 1126, 1134 (9th Cir. 1998) (citing Curnow v. Ridgecrest Police, 952 F.2d 321, 325 (9th Cir.
5 1991). Plaintiff's lack of standing to pursue Ramirez's Fourth Amendment claim does not prevent
6 them from relying on similar factual arguments to support a wholly separate claim. The court finds
7 Plaintiffs do have standing to pursue their own § 1983 claim and the Monell claim based thereon.

**C. Parents' § 1983/Fourteenth Amendment Claim**

With the standing issues resolved, the court now turns to a substantive analysis of Plaintiffs' § 1983/Fourteenth Amendment claim.

*1. Identification of a Right Cognizable under § 1983*

Section 1983 authorizes private parties to enforce their federal constitutional rights, including those substantive due process rights guaranteed by the Fourteenth Amendment. Under certain circumstances, the due process clause of the Fourteenth Amendment protects the family relationship from unwanted state government interference. See Roberts v. U.S. Jaycees, 468 U.S. 609, 617-18 (1984). In general, a parent may assert such a claim under § 1983 when his or her child is killed by law enforcement officials. Curnow, 952 F.2d at 325.

Defendants first argue, in effect, that Plaintiffs' relationship with Ramirez was too attenuated for his death to constitute the loss of a protected liberty interest. (Mot. at 14 n. 2.) Although the Ninth Circuit has not addressed this issue, the Seventh Circuit denied a parent's due process claim for loss of familial association where the child decedent was emancipated and had his own family. Russ v. Watts, 414 F.3d 783, 790 (7th Cir. 2005) (decedent was shot by officers following a car chase). Here, at the time of Ramirez's death, he was approximately 26 years old and had an eight-year old son who may have been living with the child's grandparents. (Mot., Exh. I at 9-10.) Because the parties have not argued these issues directly and the Ninth Circuit has not ruled out parental claims under similar circumstances, the court declines to award summary judgment for Defendants based on this argument.

*2. Violation of Plaintiffs' Fourteenth Amendment Right*

To show Deputy Richie's conduct violated Plaintiffs' constitutional right of familial

1   association under such circumstances, they must therefore prove Deputy Ritchie's use of force was
2   done with a purpose to harm Ramirez unrelated to legitimate law enforcement objectives.[2] Porter, 546
3   F.3d at 1137; County of Sacramento v. Lewis, 523 U.S. 833, 836 (1998). An intent to inflict harm
4   "beyond that which is required be a legitimate law enforcement objective that 'shocks the conscience'
5   and gives rise to liability under § 1983" is required. Porter, 546 F.3d at 1140 (quoting Davis v.
6   Township of Hillside, 190 F.3d 167, 172 (3rd. Cir. 1999) (McKee, J., concurring)). Liability may
7   attach in those "rare situations where the nature of an officer's deliberate physical contact is such that
8   a reasonable factfinder would conclude the officer intended to harm, terrorize or kill." Lewis, 523
9   U.S. at 174 (internal quotation marks omitted). While an officer generally does not act with a purpose
10  to harm when "responding to an emergency," a reasonable factfinder might conclude the officer does
11  intend to harm when he "creates the very emergency he then resorts to deadly force to resolve...."
12  Bingue v. Prunchak, 512 F.3d 1169, 1177 (9th Cir. 2008); Porter, 546 F.3d at 1141. The "denial of
13  due process 'is to be tested by an appraisal of the totality of facts in a given case.'" Porter, 546 F.3d
14  at 1141 (quoting Lewis, 523 U.S. at 850). The fact-intensive analysis parallels that undertaken to
15  resolve direct Fourth Amendment excessive force claims, and similarly must account for the "delicate
16  balancing act between citizens' rights to be free from undue police force and the legitimate safety
17  concerns of officers who make these life and death decisions." Id.

18        Defendants argue they are entitled to summary judgment on Plaintiffs' due process claim
19  because the evidence fails to show Deputy Ritchie acted with a purpose to harm Ramirez unrelated
20  to any legitimate law enforcement objective. They contend Deputy Ritchie responded to an
21  emergency call about an armed robbery, located individuals matching the description of the robbery
22  suspects, proceeded to chase Ramirez on foot, realized during the chase that he had no portable radio
23  contact, and then began firing at Ramirez when he believed Ramirez was reaching for a weapon to use
24  against him. Once Ramirez fell, Deputy Ritchie again interpreted Ramirez's movements as a threat
25  and, when he noticed the second suspect vehicle returning towards him, and without being aware of
26  the location of the other two Jeep occupants, fired the final shots at the fallen Ramirez. Defendants

27

28      [2]While Defendants accurately identify the governing standard for Plaintiffs' § 1983/Fourteenth Amendment claim, Plaintiffs repeatedly recite the standards for a Fourth Amendment excessive force claim. As discussed herein, the standards are different but rely on similar factual analyses.

argue Deputy Ritchie's conduct was appropriate because he reasonably (even if mistakenly) believed, under all the circumstances, that Ramirez posed a threat of imminent danger to him.

Plaintiffs counter Defendant Ritchie's actions were not "objectively reasonable" under the circumstances and that several disputed issues of material fact preclude an award of summary judgment to Defendants. First, Plaintiffs suggest Deputy Ritchie acted unreasonably when he shined his spotlight at the Jeep and then pursued Ramirez alone on foot without calling for back-up. Second, Plaintiffs argue Deputy Ritchie could not have reasonably believed Ramirez posed an immediate threat to the his safety or the safety of others at any point during the encounter. Plaintiffs contend that since Deputy Ritchie thought Ramirez was "running for his life," he should have realized Ramirez was attempting to escape rather than mount an attack. (Opp'n at 6.)[3] Plaintiffs also allege Ritchie did not call for back-up because he "voluntarily cut off his portable radio transmissions."[4] (Opp'n at 5.) Further, Plaintiffs assert that since Deputy Ritchie had observed Ramirez wearing baggy pants and had been trained to know a running suspect might use one hand to hold up his pants, Deputy Ritchie's assumption that Ramirez was reaching for weapon was unreasonable. (Opp'n at 6.) Finally, Deputy Ritchie declared he was unable to tell exactly what Ramirez was doing with his hands after Ramirez fell because Ramirez's dark gloves and clothing blended together in the low light setting. (Mot. at 16, Decl. Ritchie at ¶ 8.) Plaintiffs point to the fact that there is a street light near the scene and that later-arriving witnesses could see Ramirez's hands at a distance greater than a few feet to support their hypothesis that the area where Ramirez fell was well-lit at the time of the fatal shots.[5] (Opp'n, Exhs. 14; Exhs. R and T.) Plaintiffs therefore suggest Deputy Ritchie could see Ramirez well enough to negate any reasonable conclusion that Ramirez was reaching for a weapon after he had fallen to the

---

[3] Plaintiffs allege "Ramirez was trying to get away, *not attack [Ritchie]*." (Opp'n at 6:20-25.) However, while Deputy Ritchie did state he felt Ramirez was "running for his life" and "was not gonna stop and give up," no evidence has been submitted to question Deputy Ritchie's belief Ramirez might attack him. (Decl. Ritchie; Opp'n, Exh. 2-Interview at 8.)

[4] Plaintiffs' inference is not well-supported by the facts of the case. Several of Deputy Ritchie's are cut off, consistent with his statement that the unit had a low battery which hindered his ability to transmit successfully. (Mot., Exh. M-2.)

[5] In the photo provided by Plaintiffs, the spotlight of at least one patrol car lights the area, and Sosa's and the other officers' headlights illuminated the scene for each of them as they approached. (See Defs. Exh. W at 73:13-15; Exhs. R and T.) The distances at which the officers said they could see clearly appear to be misstated by Plaintiffs.

pavement. In addition, Plaintiffs assert there is a disputed issue of material fact as to whether Ramirez was actively resisting or evading arrest at the time of the fatal shooting. As mentioned above, the testimony of Adriana Sosa is conflicting on this point.

In support of their conclusions regarding Deputy Ritchie's tactical decisions, Plaintiffs rely on the declaration of their "expert on police procedures and policies, Jack Smith." (Opp'n, Exh. 1.) However, the Ninth Circuit has found such expert testimony, which offers a more reasonable course of action based on hindsight, fails to create a genuine issue of material fact regarding the reasonableness of an officer's use of force. Reynolds v. San Diego, 84 F.3d 1162, 1170 (9th Cir. 1996) (overruled on other grounds in Acri v. Varian Assocs., 114 F.3d 999 (9th Cir. 1997)). "The fact that an expert disagrees with an officer's actions does not render the officer's actions unreasonable." Id. The court finds the Ninth Circuit's reasoning applicable here and therefore accords little weight to Smith's retrospective analysis at this juncture of the case.

Based on the current evidentiary record before the court, there exist genuine issues of material fact on the broad question of whether Deputy Ritchie's use of force was done with a purpose to harm Ramirez unrelated to legitimate law enforcement objectives, as this standard has been defined by controlling law. Therefore, Plaintiffs have resolved this portion of the analysis to their advantage by coming forth with evidence sufficient to create these genuine issues of material fact.

*3. Qualified Immunity*

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In assessing a claim of qualified immunity, the court generally follows the two-step sequence laid out in Saucier v. Katz, 533 U.S. 194.[6] First, the court determines whether the facts as alleged by the plaintiff show the defendant violated a constitutional right. Id. at 201. If so, the court then asks whether the violated right was "clearly established" at the time of the alleged misconduct. Id. at 202. If the defendant did violate a clearly established constitutional right, he is not entitled to qualified immunity.

---

[6] In Pearson v. Callahan, ___ U.S. ___, 128 S.Ct. 808, 821-22, the Supreme Court held the Saucier protocol is not mandatory in all cases and that district courts may exercise discretion in applying it. This court finds application of the Saucier methodology appropriate in this case.

1     With regard to the first prong of the Saucier test, the court concludes, as discussed above, that while Plaintiffs do have a constitutional right to be free from governmental interference with their relationship with their son, there exist genuine issues of material fact regarding whether Deputy Ritchie's use of force was done with a purpose to harm Ramirez unrelated to legitimate law enforcement objectives. Curnow, 952 F.2d at 325; Porter, 546 F.3d at 1137; Lewis, 523 U.S. at 836. Under the second prong of Saucier, the question becomes whether this constitutional right, cognizable under § 1983, was "clearly established" at the time Deputy Ritchie acted. Under clear and controlling authority in place before July, 2005, police officers may not use deadly force indiscriminately to prevent the escape of a felony suspect no matter the circumstances but rather, may only do so if the officer "has probable cause to believe that the suspect poses a risk of serious physical harm, either to the officer or to others...." Tennessee v. Garner, 471 U.S. 1, 11 (1985). In turn, as of July, 2005, the courts had "clearly established" the right of a decedent's parents to recover for a loss of familial association when an officer unreasonably kills a fleeing suspect. Curnow, 952 F.2d at 325.

    In sum, the court finds it inappropriate to award summary judgment on Plaintiffs' § 1983 claim. The Ninth Circuit has observed that in excessive force cases, the inquiry "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom," "summary judgment...in excessive force cases should be granted sparingly." Santos v. Gates, 287 F.3d 846, 853 (9th Cir. 2002). Thus, Defendants' motion for summary judgment on Plaintiffs' § 1983 claim for loss of familial association is **DENIED**.

**D. Parents'** *Monell* **Claim against Captain Ahern and the County**

    In their First Amended Complaint, Plaintiffs allege a failure to train or supervise on the part of County and Captain Ahern. (Doc. No. 81.) In particular, Plaintiffs contend the County and Captain Ahern maintained a custom, policy, or practice of using excessive force against Latino males in an effort to intimidate those who might be subject to the gang injunction in Vista, employed an unconstitutional force policy regarding the use of alternative force, knew lives could be saved by providing adequate training in such alternatives, failed to maintain adequate training to prevent the systematic use of excessive force during arrests, failed to educate deputies on the constitutional rights of arrestees, and failed to adequately investigate, supervise, and discipline offending officers. (Doc.

1  No. 81.)  At oral argument, Plaintiffs limited their claim to a narrowly focused factual theory of
2  liability: whether the County[7] had a policy of providing inadequate training to its deputies on what
3  constitutes "imminent danger" in the context of a fleeing suspect.

4  Municipal liability lies in a policy or custom that leads to the commission of a constitutional
5  violation.  Monell v. N.Y. City Dept. of Soc. Servs., 436 U.S. 658 (1978).  In the context of an
6  inadequate training assertion, a plaintiff must show not that a particular officer reacted inappropriately
7  to a situation or was unsatisfactorily trained or supervised, but that there is a "widespread practice"
8  of inadequately training officers under circumstances showing a deliberate indifference to the need
9  for new or additional training.  Davis v. City of Ellensburg, 869 F.2d 1230, 1235 (9th Cir. 1989);
10 Canton v. Harris, 489 U.S. 378, 390-91 (1989).  Further, a plaintiff must demonstrate "a direct causal
11 link between a municipal policy or custom and the alleged constitutional deprivation."  Canton, 489
12 U.S. at 385.

13 Defendants argue Plaintiffs' Monell claim is without merit because their constitutional rights
14 were not violated and because there is no evidence of a deliberately indifferent policy or custom that
15 caused Ramirez's death.  In particular, Defendants allege the use of force policy and related training
16 are adequate, citing to the deposition testimony of various training officers and Deputy Ritchie.

17 According to the declaration of Captain Ahern, the Sheriff's Department had no policy of
18 failing to train deputies on the use of force or laws related to arrest or of encouraging or condoning
19 the use of excessive force.  (Mot., Decl. Ahern at 2.)  Deputies were trained at the academy and
20 through in-service programs in accordance with the California Commission on Peace Officer
21 Standards & Training.  (Id.)  Situations involving lethal force are investigated by individual
22 departments' Internal Affairs and Homicide divisions. (Id.) Deputy misconduct is sanctioned through
23 disciplinary actions in accordance with the County Civil Service Rules and the California Peace
24 Officer's Bill of Rights.  (Id. at 2-3.)  Captain Ahern also stated the department had no policy to
25 discriminate against individuals on the basis of race, ethnicity, age, or gender in providing law

---

[7] Plaintiffs included Captain Ahern as an object of their Monell claim, but they make the same allegations against both Captain Ahern and the County.  Defendants challenge the claim against Captain Ahern as an improper Monell claim.  The court agrees and, in light of the narrowly tailored Monell inquiry discussed at oral argument, the court **GRANTS** summary judgment for Defendants on the failure to train claim against Captain Ahern.

1  enforcement services nor to use gang injunctions to impermissibly stop individuals not subject to the
2  injunctions. (Id. at 3.) The deposition testimony of the other officers indicates deputies were trained
3  in the use of lethal force in response to a range of conduct by a suspect. (See generally, Mot., Decls.
4  Ritchie, Sanfilippo, Crysler, Cross, Miller.)

5  In opposition, Plaintiffs generally rely on rather attenuated inferences from various officer
6  testimony in an attempt to show Sheriff's deputies do not engage in any use of lethal force training
7  nor do they understand when such force should be used. For example, Plaintiffs allege that Deputy
8  "Ritchie does not recall being trained in the use of force" when Ritchie was responding to questions
9  about in-service training and did state he had been trained in the use of force at the Academy. (Opp'n
10 at 9:23-28; Opp'n, Exh. 2 at 38-42, 49.) Although Deputy Ritchie describes scenario training
11 involving de-escalation tactics, Plaintiffs state Deputy Ritchie "was not trained in the use of de-
12 escalation tactics or the use [of] verbal commands." (Opp'n, Exh. 2 at 51-52; Opp'n at 10:1-2.) In
13 describing a "Use of Force Options Chart," used for training purposes, Plaintiffs state that Lieutenant
14 Margaret Sanfilippo "testified [the chart depicts] that any response, including deadly force, is allowed
15 in response to any action by a suspect." (Opp'n at 10:24-26.) However, Lieutenant Sanfilippo's
16 testimony states that the chart "tells a deputy sheriff that they can choose any response reasonable to
17 control any type of subject" within the range shown by the chart for particular defined conduct by a
18 suspect. (Opp'n. Exh. 9 at 48-49.) Similarly, while Plaintiffs make much of Sergeant Miller's
19 testimony that "Sheriff's deputies may go to use of deadly force immediately, 'without having to yell
20 or talk to suspects nicely,'" the statement should be interpreted in conjunction with the Use of Force
21 Chart described above, which shows a range of appropriate responses for a deputy faced with a certain
22 level of suspect conduct. (Opp'n at 10:21-23; Opp'n, Exh. 5 at 87-89.)

23 Focusing on the narrow allegation regarding the use of force where "imminent danger" is
24 present, Plaintiffs allege the County does not train its deputies to understand how this concept should
25 apply to the use of force on a fleeing suspect. Plaintiffs allege Deputy Crysler stated that "use of
26 deadly force is justified by whatever the deputy's feelings are at the time." (Opp'n at 10:17-21, Exh.
27 3 at 77-78.) As Defendants point out, Crysler actually stated: "The lethal force is to be applied for the
28 preservation of life, to protect one's life, a deputy, or to prevent a violent felon from possibly incurring

1  death or harming subjects that they may encounter in the near future" and is justified based on "the
2  totality of the circumstances." (Defs. Reply, Exh. R at 65, 76.) Plaintiffs contend that Deputy Ritchie
3  himself "received poor training on what is imminent danger, which is a vague term to Ritchie."
4  (Opp'n at 10:4-6, Exh. 2 at 36-37.) However, Deputy Ritchie himself identified that while "imminent"
5  is a "vague" word, to him it meant "immediate danger of" or "about to happen." (Defs. Reply, Exh.
6  U at 68.) It is difficult to identify a lack of training where even the deputy whose conduct is at issue
7  can adequately define the "imminent danger" standard.

8  Finally, Plaintiffs point to the testimony of their police expert, Jack Smith, who concluded
9  Deputy Ritchie "may be the subject of *negligent* training and retention...on the use of lethal force to
10 apprehend a fleeing subject." (Opp'n at 23 (emphasis added).) Even if the expert's conclusions are
11 taken as true, negligence alone does not establish municipal liability. Plaintiffs must show the County
12 made a conscious decision indicating "deliberate indifference" to their constitutional rights. Canton,
13 489 U.S. at 389.

14 Here, there is no credible evidence of any failure to train or supervise, and further, no evidence
15 the County made a deliberate choice to avoid adequate training, nor that such a choice was made
16 where "the need for more or different training [was] so obvious, and the inadequacy so likely to result
17 in the violation of constitutional rights, that the policymakers...can reasonably be said to have been
18 deliberately indifferent to the need." Id., 489 U.S. at 390. Viewing the evidence in the light most
19 favorable to Plaintiffs, there is no genuine issue of material fact to advance Plaintiffs' claim. The
20 court therefore **GRANTS** Defendants' motion for summary judgment on Plaintiffs' Monell claim
21 against the County of San Diego.

22 **E. Punitive Damages**

23 Defendants object to Plaintiffs' claim for "exemplary" or punitive damages, arguing there is
24 no evidence any of the defendants exhibited conduct motivated by evil motive or intent or involving
25 reckless or callous indifference to Plaintiffs' federally protected rights. Smith v. Wade, 461 U.S. 30,
26 56 (1983). Plaintiffs make no comment on this issue in their opposition. Because a finding of mental
27 culpability will flow from an evaluation of the facts underlying Plaintiffs' § 1983 claim, the court
28 **DENIES** Defendants' motion for summary judgment.

### III. CONCLUSION

For the reasons set forth above, the court **GRANTS** the parties' requests for judicial notice as to the particular documents cited herein. In addition, the court:

1) **GRANTS** Defendants' motion for summary judgment on the decedent's § 1983 excessive force claim and the Monell claim derived therefrom;

2) **DENIES** Defendants' motion for summary judgment on Plaintiffs' § 1983 claim for loss of familial association;

3) **DENIES** Defendants' motion for summary judgment as to the availability of punitive damages;

4) **GRANTS** Defendants' motion for summary judgment on Plaintiffs' Monell claims against Captain Ahern and the County of San Diego, which are derived from their § 1983 claim for loss of familial association; and

5) **DENIES AS MOOT** Defendants' motion for summary judgment on the decedent's state law claims.

**IT IS SO ORDERED.**

DATED: April 15, 2009

_____
Hon. Jeffrey T. Miller
United States District Judge